(Decided Feb'y 24th, 1864.)

The United States for the use of the Washington Aqueduct, *vs.* The Great Falls Manufacturing Company.

The Act of Cong. 2nd Sess. 1852, ch. 97, and Act of 1853, ch. 179, of Md., constitute a Compact between the State and U. S. Condemnation of Lands: Act of 1853, ch. 179, a Grant: Caveator and Caveatee.—An appropriation was made by Congress in 1852, for the purpose of procuring a supply of water for the cities of Washington and Georgetown, upon condition that it should not be drawn from any source within the limits of the State of Maryland, without the consent of the Legislature. By the Act of 1853, ch. 179, the Legislature

of Maryland gave its consent to the United States "to purchase such lands and to construct such dams, reservoirs, buildings, and other works, and to exercise concurrently with the State of Maryland, such jurisdiction over the same as may be necessary for said purpose." Upon the authority of these Acts, it was determined to draw the water from the Potomac River in Maryland, and a site for the dam was located. After this site was so located, and with knowledge of such location, the G. F. M. Co. obtained from the Land Office a common warrant for the land across which the said dam was located. Upon a *caveat* filed by the United States against the issuing of a patent for said land; HELD:

1st. That the Act of the Legislature of Maryland and the Act of Congress constituted a compact, in reference to which, the United States and the State of Maryland, stood in relation of contracting parties.

2nd. That the assent of the Legislature given in the 1st section of the Act of 1853, to the purchase of such lands by the United States, must be construed as a grant of a right to purchase, which the State was not at liberty to qualify or impair by any subsequent Act of the Legislature or of its public officers.

3rd. That the power to enter upon and appropriate lands by process of condemnation, conferred upon the United States, was restricted by its nature, as well as by the terms of the Act to the property of *private persons*, and under these circumstances, the grant of the right to purchase clearly implied, so far as the State was the owner of lands that might be required, a promise or undertaking on its part to hold them subject to that right.

4th. That the right of choice as to the source of supply, location of lands, &c., conferred upon the United States, imposed a restraint upon the power of the State to alienate such of its lands as the United States had declared to be necessary for their use, in such a way as to oppose or burden the rights and privileges conferred with inconsistent and disabling conditions.

5th. That the United States by their priority of location had secured a priority of right which must prevail as against the cavatee, and could not be disturbed or set aside.

APPEAL from a decision of the Commissioner of the Land Office.

The United States, under the circumstances detailed in the opinion of this Court, having located the site of an Aqueduct dam at or near the Great Falls in the Potomac River, and upon the soil of the State of Maryland, the Great Falls Manufacturing Company afterwards, and with knowledge of this fact, obtained a common warrant from the Land Office for a tract of land which included and was

bisected by the proposed dam; whereupon the United States filed a *caveat* against the issuing of a patent for said land. The Commissioner of the Land Office (SEABROOK) upon hearing of the case overruled the *caveat*, and the caveator appealed, and filed in writing the following reasons therefor:

"1st. The land sought to be patented is covered by the waters of the Potomac River, and the bed of said river, and the water flowing over the same, and is a portion or part of the *jus publicum*, and therefore it is not in the power of the State to grant the same to individuals, or private companies for private use or speculation, or for any other than public purposes.

"2nd. Because it would be in derogation of rights conferred upon the Potomac Company, and also rights conferred upon the Chesapeake and Ohio Canal Company.

"3rd. Because the State of Maryland, by her Act of 1853, ch. 179, granted to the United States the bed of the river, as well as the right of way, and also the use of the water, for purposes which have been declared constitutional by the Court of Appeals, to wit: 'The Washington Aqueduct, subject to rights acquired by the Chesapeake and Ohio Canal Co., under its charter, and from the Potomac Company;' and therefore it is incompetent for even the State to issue a patent, which would necessarily conflict with such grant.

"4th. Because the grant or patent for any portion of the bed of the river, could confer no substantial rights, and its only effect would be to tempt the grantee into a conflict with the United States, or to interfere with the public right of using the water for domestic purposes, navigation and fishing, which the State can neither destroy or impair.

"5th. Because the dam of the Washington Aqueduct proposed to be constructed under the grant to the United States by the Act of 1853, ch. 179, has been located, and cuts the land covered by this certificate in two, and destroys the

contiguity, which, according to the rules of the land office, is fatal.

"6th. Because the law of Maryland having reserved to the public the water flowing over any land granted by the patent, in as much therefore as all or nearly all the land sought to be patented in this certificate is covered by the waters of the Potomac River, the right of the public cannot be preserved, except by a denial of the patent, or if granted, unless the patent should expressly upon its face reserve the water.

"7th. Because in as much as the United States has the right to select, as against the whole world, the site of an aqueduct dam, at or near the Great Falls, and the site now selected, or which may be selected hereafter, can be changed if found unsuitable, and *toties quoties*, until the site selected shall be satisfactory in every respect, therefore no patent ought to be granted which will conflict with such right."

The cause was argued before BARTOL, GOLDSBOROUGH and COCHRAN, J.

*N. Brewer* and *O. Miller*, for the appellant:

1st. The Act of 1853, ch. 179, is an express grant of both the waters of the Potomac and the soil covered thereby, for the purposes of the Act, so far as is compatible with the prior grants to the Potomac Company and Chesapeake and Ohio Canal Company.

2nd. If not an *express grant,* it is a grant by *necessary implication* of the bed of the river as well as its waters. The *nature* of a *dam* requires the *occupation of the soil.* The *purpose* of *this dam* requires its *permanent occupation*, the right of stopping and throwing back the water, creating an immense reservoir as contemplated by the Act, the building of coffer-dams, walls, &c., &c. All of these must be exclusive rights not to be interfered with. The violation or

interference with any one of these rights, when once exercised, would result in a *great public calamity.* *Ang. on Water Courses, sec.* 158.

The charter of the Alexandria Canal Company, by Congress, contained just such an implied grant with reference to this very river. *City of Georgetown vs. Alex. Can. Co.,* 12 *Peters.* 12 *Curtis,* 651.

3rd. Had the Legislature of Maryland the right to grant by Act of Assembly, as we say she *has granted?* The right of the State originally to grant the land sought to be patented, is conceded on all sides. See *Bl. Ch. Dec.,* 128. Opinion in *Gr. Falls Cond. Case.* The appellant relies upon a *legislative grant;* the appellees on the right to grant *by patent.* The right of the State to grant by *legislative Act,* can hardly be disputed. The Act of 1745, ch. 9, has been construed to be a *legislative grant* of vacant lands covered by water, to the owners of adjacent water lots, without applying to the land office in the usual way, in consideration of certain improvements materially beneficial to the public. *Hammond's Lessee vs. Inloes,* 4 *Md. Rep.,* 138. The Supreme Court of the United States have sustained a *legislative grant of the bed of the Potomac River,* (for purposes almost identical with those in the present grant,) by Congress, deriving the authority of Congress so to grant from the States of Virginia and Maryland. Above case in 12 *Curtis, p.* 650. Applying to the reasoning of the Court in 12 *Curtis,* the Maryland doctrine that the Potomac is wholly in Maryland, the authority of Congress to make the grant in that case was derived from Maryland.

4th. Is the Act of 1853, ch. 179, *constitutional as a legislative grant* under Art. 3, sec. 17, of the Constitution of Maryland. *Reddall vs. Bryan,* 14 *Md.,* 477, 478.

5th. Supposing our *legislative grant* to be concurrent with the grant by patent, in point of date, &c., instead of a prior grant, as is actually the case, we say:

(1.) That the legislative power to grant is the more comprehensive. A State may grant by *legislative Act,* not only

lands, the title to which is in the State at the passage of
the Act, but lands that might thereafter vest in the State
by escheat. *Ang. & Ames on Corp.*, sec. 169, *p.* 133, *7th ed.*

(2.) Considering the *purposes* of the respective grants
there can be no doubt that the grant to the United States
should be preferred. Its purpose is to supply the seat of
government of the United States with an abundance of
wholesome water. *Reddall vs. Bryan*, 14 *Md.*, 477. What
are the purposes of the grant to the Great Falls Manufac-
turing Company? As a *Manufacturing Company*, desiring
to use water-power, it was unnecessary to own the soil cov-
ered by the river. Their right to use the water of the Po-
tomac was guaranteed by the 13th section of the Act of
1784, ch. 33. The land itself, *as land*, could be of no sub-
stantial value to the *Company*. It is covered by water.
They could not use it as land, except in violation of the *jus
publicum*. Its possession could only serve to bring them
into collision, and provoke contention with the riparian
proprietors on the other side, and with the United States.
See *Chapman vs. Hoskins*, 2 *Md. Ch. Dec.*, 485. *Ham-
mond's Lessee vs. Inloes, et al.*, 4 *Md. Rep.*, 138. *Angell on
Water Courses*, secs. 12, 14, 535, 536, 541, 545. *Brown vs.
Kennedy*, 5 *H. & J.*, 195. What then are the purposes for
which the grant of these lands is so eagerly sought by the
Great Falls Manufacturing Company? We say for the
purpose of *speculating upon the necessities of the Government*—
a favorite purpose with many, which, fortunately, has of
late met with a wholesome check. This purpose is to be
gathered from the conduct of the Company. *U. S. Sen.
Doc.*, vol. 2, 1859–'60.

6th. The State of Maryland as long ago as the year 1784,
by its Act of Assembly of 1784, ch. 33, granted to the Po-
tomac Company rights utterly inconsistent with the pro-
posed grant by patent to the Great Falls Manufacturing
Company, all of which rights were subsequently conferred
on the Chesapeake and Ohio Canal Company. See also,
1823, ch. 40, sec. 9. The patent applied for should not be

issued, therefore, because it would be in derogation of the rights of the Chesapeake and Ohio Canal Company. *Can. Co. vs. R. R. Co.*, 4 *G. & J.*, 1. The State will never knowingly grant the same land a second time. *Twiggs vs. Jacobs*, 4 *Md. Ch. Dec.*, 541.

7th. Under the Act of 1852, ch. 129, no patent can be lawfully issued in this case. *See the title and last clause of sec. 1 of that Act.*

(1.) What is meant by the term *"navigable waters?"* Does it mean, as in the admiralty cases, *so much of every river or stream as is affected by the ebbing and flowing of the tide*, or does it mean, in the more general acceptation of the term, as in the more recent cases, *so much of the rivers and streams of the State as are available for boating, scowing, rafting or floating saw-logs, or other valuable floatage?* We contend for the latter meaning. The Act was passed with immediate reference to oyster beds in the rivers and creeks of lower Maryland, affected by the ebb and flow of the tide; but speaks generally with reference to *all navigable waters* of the State.

In its general application this Act is only declaratory of what was before the law. It professes nothing more. (See the preamble to the Act.) The doubts spoken of as existing in the preamble, do not seem to have been entertained by the learned judges who sat in the case of *Browne vs. Kennedy*, 5 *H. & J.*, 196, of whom three filed elaborate opinions, viz: Judges *Chase, Buchanan and Earle.* See head note, p. 196. "The king of England, &c., had the right to grant," &c., and also that commencing "Where the lines of a grant include a *navigable river*," &c. We rely on this case 1st, as showing that the law as *declared* by the Act of 1862, had been emphatically announced as the law of the land by this Court many years before; and 2nd, and more especially, as showing the nature of the stream spoken of in this case as *"navigable waters"* or *"public rivers,"* as distinguished from *"private rivers,"* a descriptive term more generally used in the modern cases. See opinion of Buchanan, J. on

p. 204; see the statement of the case p. 197, the description of "*Jones' Falls*," the part thereof included in the grant.

The Potomac River is boatable far above that portion of it included within the lines of the patent sought to be obtained, "*Neilson's Desire*," and available for boating, scowing, rafting and other valuable floatage, difficult to be crossed by *pontoon bridges*, more available for such purposes than any part of "*Jones Falls*" within the lines of "*Todd's Range.*"

*Angell on Water Courses*," sec. 535: "All rivers above the flow of tide-water, are *prima facie* private; but when they are naturally of sufficient depth for valuable floatage," &c. This law dates as far back as the times of Sir Matthew Hale. (See *Harg. Tracts De Jure Maris*, &c.) *Angell* also at *sec*. 536, "The Potomac River is part of the *jus publicum*," &c., citing the case in 12 *Peters*, 91, and *Binney's Case*, 2 *Bl*., 99. There are many instances where similar streams are classed as "*public rivers*," "*public highways*," &c. See case of *Carson vs. Blazier*, 2 *Binney*, 475, declaring the Susquehanna and other rivers navigable streams. The law of Maryland referred to in *Angell*, as expressly declaring the *Potomac River* to be "*navigable as a public highway*," is the Act of 1784, ch. 33, sec 10. See also the Act of 1768, ch. 5, passed sixteen years before the Potomac Company was chartered, entitled an Act to prevent any obstruction of *the navigation* of the River Potomac. This Act refers expressly to that part of the river "between the Great Falls and Wills' Creek." See also the Act of 1802, ch. 84, declaring the object contemplated by the Act of Assembly establishing a company for opening and extending the navigation of the River Potomac to have been accomplished. See also the Acts of 1806, ch. 89, a supplement to the Act of 1768, ch. 5, and 1824, ch. 70, sec. 13.

8th. In answer to the objection that the Act of 1862, ch. 129, was passed pending this appeal, we refer to the case of *Keller vs. The State*, 12 *Md. Rep*., 323.

*A. Randall* and *A. B. Hagner,* for the appellees :

1st. That there is nothing in the record to show that the land in question is covered by the waters of the Potomac. Indeed, the 8th reason of the appellants admits that there is no proof of the assertion, and makes the surveyor's omission to state that any part of the land is covered by water, a reason for reversing the decision of the Commissioner. But on the contrary the record shows affirmatively, that the land is out of water, and the greater part of it was granted by the State nearly a century since, as high land. But if it were all covered by water, the legal proposition advanced in the above reason, could not be sustained. The title of the State of Maryland to the land at the bottom of the Potomac River to high water mark on the Virginia shore, and her right to grant portions of it not yet granted by patent or otherwise, is too firmly settled to be questioned now. *Binney's Case,* 2 *Bland,* 127. Such grants, of course, are subject to the public right of fishing and navigation, but the land beneath the water belongs to the grantee of the State as much as the soil of a public road within a farmer's lands belongs to him, though he cannot prevent the public from passing over it. *Chapman vs. Hoskins,* 2 *Md. Ch. Dec.,* 491.

2nd. An examination of the Acts of 1784, ch. 33, and 1823, ch. 140, will clearly show "that nothing in either of them," in the words of the able opinion of the Commissioner, "can be construed into a grant by the State of *any* of her vacant land;" still less of this land, with which neither of the companies alluded to, so far as the record shows, ever had any connection. But if our claims are in derogation of the rights of the Potomac Co. and Ches. and Ohio Canal Co., the Act of 1853 is equally so, and therefore confers no right upon the government of the United States.

3rd. There is nothing in the Act of 1853, ch. 179, which can reasonably be construed into a grant of any land to the United States for the use of the Aqueduct. The Act authorizes the United States to *buy* or *condemn* lands in the

manner therein pointed out, and if the United States had been more vigilant, it might have obtained a patent for the vacant lands in this resurvey, or it can now buy them from the present owners, or condemn them according to the law. The record shows that the Government did apply to the Land Office to buy the land long after the passage of the Act of 1853, but the Commissioner declined to part with the State's title except in the usual mode by warrant, &c. That Act was simply a grant of *concurrent jurisdiction* to the United States over the lands which might be "*purchased*" for the purposes of the Aqueduct. The title fully discloses its real and only objects, and any thing in the body of the Act outside of the title is to be considered as "irrelevant and void." *Davis vs. State*, 7 *Md. Rep.*, 157.

Does the *title* imply any thing like a *grant* by the State of its public domain ? Its words are "An Act *giving the assent* of the State of Maryland to such plan as may be adopted by the President of the United States for supplying the city of Washington with water," surely there is nothing like a *grant* of land disclosed here.

The preamble, "The key of the Statute," declares, that whereas, Congress has appropriated money "*for the purpose of supplying* the city of Washington with water, upon such plan as the President of the United States may approve, *on the condition*, that if such plan should require said water to be drawn from any source within the limits of the State of Maryland, *the assent of that State* should first be obtained," (not that a *grant* should first be obtained,) and whereas, by a joint resolution of Congress in 1841, "it is provided that no public money shall be expended upon any land or site hereafter *to be purchased* for the United States, until the consent of the Legislature of the State in which the land or site may be, shall be given for *such purpose*, and as it is also made the duty of the Secretary or head of the proper department, to apply to said Legislature for a cession *of the necessary jurisdiction* over said lands." It seems clear that there is nothing like a *grant*

here, for the preamble evidently speaks as of the assent of the State to the *purchase*, and of the *cession of jurisdiction*.

The 1st section explicitly says, that if the water should be drawn from within the limits of the State, "*consent* is hereby given to the United States *to purchase* such lands, and to construct such dams, reservoirs, buildings and other works, and to exercise concurrently with the State of Maryland *such jurisdiction over the same* as may be necessary for *the said purpose.*"

It seems equally clear, that this section only announces the consent of the State to the *purchase* of lands, and to the exercise of such concurrent jurisdiction as might be necessary in building and maintaining the aqueduct, and cannot be considered as a grant.

The 2d and 3d sections of the Act simply authorize the United States *to* condemn lands where their agents "cannot agree with the owners for the *purchase*," &c., according to the plan prescribed in the charter of the Chesapeake and Ohio Canal Company.

The 4th section reserves all rights vested in the Canal Company, or granted by it to individuals; and the 5th section requires the adoption of proper measures to guard the canal from injury by the construction of the aqueduct.

The whole Act really does not seem to be as full a grant by the State as ch. 185 of the same year, "ceding to the United States the jurisdiction over the addition to the site of the Naval School at Annapolis," and is certainly as bare of anything like an *express* grant of property.

It is not denied that the State may give its property to the United States, or to individuals, by proper legislative grant. But wherever it has undertaken to do so, the grant has been *explicit;* as in the Act of 1745, ch. 9, sec. 10, referred to in *Wilson's Lessee vs. Inloes,* 11 *G. & J.,* 357.

It is insisted by the appellant, that the grant may be *implied* from the language of the Act of 1853, and the case of the *Corporation of Georgetown vs. Alex. Can. Co.,* 12 *Peters,* 91, is relied upon in support of the position. But

17 .    v. 21

in that case there was no question as to the title of the bed of the river. It was simply an application to restrain by injunction the construction of the aqueduct, as a public nuisance. The Court held that the grant by Congress, in 1830, to the Alexandria Canal Company, was necessarily a grant of the right to build the aqueduct complained of. A comparison, however, of the Act of Congress, of 1830, 6 *Stat. at Large,* 420, and the Maryland Act of 1853, ch. 179, will show that the language of the two is widely different.

We deny that the Act of 1853, ch. 179, does grant the use of the water of the Potomac to the United States, as alleged. It only *consents* that the Government may purchase lands having water privileges. But if it did grant the use of the water, we deny that this would " necessarily imply the grant of the bed of the river." For if this were so, the State had long before granted the bed of the river to the Chesapeake and Ohio Canal Company.

4th. There is nothing to show that any of this land is covered by water. Moreover the patent can confer no right upon the patentee, inconsistent with the rights of public fishery and navigation, if the land were covered by navigable water, or of public fishery and use of the water after it has flowed over the land, if it were covered by unnavigable water. The case of *Chapman vs. Hoskins,* decides no such proposition as is here contended for: If the Court sees that the patent will be inoperative, because of a prior title existing for so long a time as to present an impregnable title against the State's grant, it will not issue the patent. But the State has never refused to sell any part of her vacant land, because it is represented to be of small value, and likely, for this reason, to be an unprofitable bargain to the buyer. If the United States desires to buy the land from the appellees, the parties can agree upon terms, or if not, the right of condemnation by a jury is expressly given by a law of the State. No right of *navigation* can be interfered with by a patent, for the Potomac here is a foaming

torrent rushing over rocks, and is scarcely more navigable than Niagara itself.

5th. There being no proof whatever of the matter alleged in the fifth reason of appeal, it is unnecessary to discuss it.

The 6th and 7th reasons are conclusively answered in the opinion of the Commissioner.

In reply to the 8th reason, we say that no such duty was imposed upon the surveyor by the warrant, or by any rule of the Land Office.

Cochran, J., delivered the opinion of this Court:

An appropriation was made by Congress, in 1852, for the purpose of procuring from such place as the President of the United States should approve, a supply of water for the cities of Washington and Georgetown, upon condition that it should not be drawn from any source within the limits of this State, without the consent of the Legislature.    To advance this enterprise, the Legislature passed the Act of 1853, chap. 179, giving its consent in the following terms: "That if the plan adopted by the President of the United States for supplying the city of Washington with water should require said water to be drawn from any source within the limits of the State, consent is hereby given to the United States to purchase such lands, and to construct such dams, reservoirs, buildings and other works, and to exercise concurrently with the State of Maryland, such jurisdiction over the same as may be necessary for the said purpose."    It was then determined, upon the authority of these acts, to draw the water from the Potomac River, in Montgomery County, at a point above the Great Falls, and the line or site of a dam across the bed of the river, from Conn's Island to the Virginia shore, was so located as to bisect and divide the tract of land shown by the survey in this case.    This survey was had upon a common warrant, issued from the Land Office on the 21st of August 1858, the survey having been returned thereto on the 18th of

August 1859. The *caveat* against the issue of a patent, thereon, was filed by the United States on the 20th September following, on the ground that it would be a violation of the rights and privileges vested and granted by the Act of 1853. Other reasons of an incidental nature were also assigned, and duly considered in course of the argument, but as we have reached the conclusion that the case must be determined by the construction of the Act of 1853, it will not be necessary to consider them in this opinion.

The Legislature evidently intended by this Act to vest the United States with full power to acquire and appropriate such lands within the limits of the State, as should be found necessary to execute the purpose contemplated by the Act of Congress; and we may add, that these Acts taken together, constitute a compact, in reference to the subject matter of which the United States and the State of Maryland stand in relation of contracting parties. The assent of the Legislature, given in the 1st sec. of the Act of 1853, to the purchase of such lands by the United States as should be found necessary for the purpose designated, must therefore be construed as a grant of a right to purchase, which the State was not at liberty to qualify or impair by any subsequent Act of the Legislature, or of its public officers. The power to enter upon and appropriate lands by process of condemnation, conferred upon the United States, is restricted by its nature, as well as by the terms of the Act, to the property of private persons, and under these circumstances, the grant of the right to purchase clearly implies, so far as the State was the owner of lands that might be required, a promise or undertaking on its part to hold them subject to that right. This implied obligation or understanding, was an essential element of the right of purchase granted to the United States. If it were not so, the State would be able by refusing to part with, or hold its lands for the use proposed, to defeat the right granted, as well as prevent the execution of the purpose contemplated by the Act of Congress, and to which its consent had been given

in the solemn form of a public law. The mutual intention and purpose of these Acts, clearly forbids any interpretation of their several provisions leading to such results. But the proposition here may be placed upon a broader ground. The United States were vested by the Act of 1853 with a right of choice as to the source of supply, location of dams, reservoirs, buildings and other works, as well as with full power to subject, by purchase or process of condemnation, any property to their use that might be found necessary.

Could it be pretended under these circumstances, that the grant of powers so important and exclusive imposes no restraint upon the power of the State to alienate such of its lands as the United States have declared to be necessary for their use; or upon the other hand, that the State, notwithstanding this grant, may still dispose of its lands in such a way as to oppose or burden these rights and privileges with inconsistent and disabling conditions ? Not at all. The theory, that any right is retained to oppose or qualify the exercise of the powers and privileges granted to the United States by this Act, is supported neither by reason nor authority, and we are constrained to say, that it should be repelled by every public officer and tribunal charged with the duty of maintaining the good faith and honor of the State. This important question was carefully considered in the *Can. Co. vs. R. R. Co.*, in 4 *G. & J.*, 1, and the conclusions of the Court there stated fully sustain the views we have presented here. In speaking of an Act of incorporation conferring powers and privileges, similar in all respects to those claimed by the United States under the Act of 1853, the Court said that when accepted, "it amounts to a grant, and the rights conferred to a vested franchise, existing independent of any act of location or survey, which the State cannot reassert nor grant to any other," and is therefore "a prior right to which all subsequent grants must yield." The priority of the grant establishes a priority of right, whether it attaches to and af-

fects the lands of the State, or reaches the property of private persons through the common process of condemnation.

The appellee does not appear to have proceeded in ignorance either of the rights or purpose of the United States, but on the contrary to have been fully informed in regard to both. The plat returned with this certificate of survey, by certain lines, marks and explanations, shows the line or site of the dam as located by the agents of the United States. The right of the United States under the Act of 1853, in its most restricted sense, was fully equal to that of the appellee under the rules prescribed by law for the transmission of the State titles through the agency of the Land Office; and even in that view, to say nothing of the exclusive character of the powers and privileges granted by the Act of 1853, we must hold that the United States, by this location, had reached at a prior date the same point in establishing a valid claim for a title, that the appellee has reached by its warrant for a survey, and the location shown by the return of this certificate. A case is thus presented, in which the United States have a priority of right by priority of location, and, according to the rule well established in this State, that right must prevail. *Hoye vs. Johnson,* 2 *Gill,* 291. *Can. Co. vs. R. R. Co.,* 4 *G. & J.,* 54, 150. It is not necessary to determine, whether the United States should take further proceedings to perfect their title, nor the character of such proceedings; it is enough to decide that, in virtue of their powers under the Act of 1853, and the location made, they acquired a priority of right that cannot be disturbed or set aside. If a patent were to issue, the evident result would be a contest with the United States, and, in our opinion, it will be most in accordance with sound public policy, to refuse that which, in the nature of the case, would become both the inducement and weapon of a mischievous and profitless controversy.

For these reasons we think the *caveat* was good, and therefore reverse the order of the Commissioner of the

Land Office by which it was overruled with costs to the appellees.

*Order reversed and caveat sustained.*

(Decided Feb'y 24th, 1864.)